UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES CLEM, Derivatively on Behalf of EATON CORPORATION, | ) ) ) | Case No. 1:11-cv-2515 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| ALEXANDER M. CUTLER, RICHARD H. FEARON, NED C. LAUTENBACH, GARY L. TOOKER, MICHAEL J. CRITELLI, DEBORAH L. MCCOY, GREGORY R. PAGE, CHRISTOPHER M. CONNOR, CHARLES E. GOLDEN, ARTHUR E. JOHNSON, TODD M. BLUEDORN, GEORGE S. BARRETT, JOHN R. MILLER, VICTOR A. PELSON, and ERNIE GREEN, | ) ) ) ) ) ) ) ) ) ) ) ) | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT** |
| Defendants, | ) ) | |
| - and - | ) ) | |
| EATON CORPORATION, an Ohio corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | **DEMAND FOR JURY TRIAL** |

Plaintiff, by his attorney, alleges as follows:

### NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by plaintiff on behalf of nominal

defendant Eaton Corporation ("Eaton" or the "Company") against certain of its officers and

directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in

damage to Eaton's reputation, goodwill, and standing in the business community.  Moreover,

these actions have exposed the Company to hundreds of millions of dollars in potential liability

for violations of state and federal law.

- 1 -

2.     This case arises out of the Individual Defendants' (as defined herein) responsibility for an illegal scheme that caused Eaton to conspire with original equipment manufacturers ("OEMs"): (i) Freightliner LLC ("Freightliner"); (ii) International Truck and Engine Corp. ("International"); (iii) PACCAR Inc. ("PACCAR"); (iv) Volvo Trucks North America ("Volvo"); and (v) Mack Trucks, Inc. ("Mack") during the period from October 1, 2002 to the present.

3.     Eaton accomplished this goal though the implementation of a series of exclusive dealing arrangements among and between Eaton and the OEMs.  The exclusive dealing agreements were put in place in order to foreclose the Class 8 Truck Transmissions Market from Eaton's competitors, especially Eaton's biggest competitor, ZF Meritor LLC ("ZF Meritor"). Defendants' illegal, anticompetitive conspiracy was highly successful in eliminating competition in the market for Class 8 truck transmissions, thereby allowing Eaton to maintain and enhance its monopoly power.

4.     Eaton's gains from its illegal actions, however, were only temporary.  ZF Meritor filed a lawsuit against Eaton alleging violations of both the Sherman Act and the Clayton Act in the United States District Court for the District of Delaware, Case No.06-623-SLR (the "ZF Meritor Action").  On October 30 2009, a jury determined that Eaton's exclusivity agreements with the OEMs constituted a contract, combination, or conspiracy that unreasonably restrained trade.  ZF Meritor is seeking more than $800 million in damages.  This figure does not include the huge legal fees the Company has been forced to expend defending itself of the charges brought about by the Individual Defendants' illegal acts.

5.     Further, as a direct result of this unlawful course of conduct, the Company is now the subject of numerous class action lawsuits filed in the United States District Court for the District of Delaware by market participants injured by the Individual Defendants' improper and illegal conduct.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

7.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

8.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Eaton maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Eaton occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

9.    Plaintiff James Clem was a shareholder of Eaton at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Eaton shareholder.  Plaintiff is a citizen of California.

**Nominal Defendant**

10. Nominal Defendant Eaton is an Ohio corporation and a diversified power management company. Eaton is a global technology leader in electrical components and systems for power quality, distribution, and control; hydraulics components, systems, and services for industrial and mobile equipment; aerospace fuel, hydraulics, and pneumatic systems for commercial and military use; and truck and automotive drivetrain and powertrain systems for performance, fuel economy, and safety. Eaton's principal executive offices are located at 1111 Superior Avenue, Cleveland, Ohio. Eaton is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.

**Defendants**

11. Defendant Alexander M. Cutler ("Cutler") is Eaton's Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") and has been since 2000; President and has been since 1995; and a director and has been since 1993. Cutler has also served in various other positions at Eaton since at least 1986, including President, Industrial Group; President, Controls Group; Executive Vice President, Operations; Executive Vice President and Chief Operating Officer, Controls; and Chief Operating Officer. As CEO, Cutler is responsible for the Company's improper and illegal arrangements with the OEMs. Cutler knowingly, recklessly, or with gross negligence failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power. Eaton paid Cutler the following compensation as an executive:

| Year | Salary | Bonus | Other Annual Compensation | Stock Awards | Option Awards | Stock Options (Shares) | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | Long-Term Incentive Payouts | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | $1,175,100 | - | - | $3,595,263 | - | - | $6,665,063 | $1,226,019 | - | $137,151 | $12,798,596 |
| 2009 | $973,248 | - | - | $5,099,874 | - | - | $575,000 | $1,732,144 | - | $155,741 | $8,536,007 |
| 2008 | $1,132,500 | - | - | $1,413,210 | $1,973,981 | - | $3,987,500 | $1,333,347 | - | $237,298 | $10,077,836 |
| 2007 | $1,069,305 | - | - | $1,373,770 | $2,487,800 | - | $9,520,197 | $1,341,315 | - | $224,778 | $16,017,165 |
| 2006 | $1,024,620 | - | - | $809,922 | $1,995,959 | - | $8,162,063 | $1,995,424 | - | $139,961 | $14,127,949 |
| 2005 | $1,018,050 | $1,670,259 | $178,233 | $1,036,350 | - | 201,000 | - | - | $6,367,544 | $22,259 | $10,292,695 |
| 2004 | $979,334 | $2,167,440 | $122,552 | $1,593,000 | - | 242,000 | - | - | $4,517,381 | $20,806 | $9,400,513 |
| 2003 | $950,004 | $1,504,807 | $106,726 | $931,665 | - | 242,000 | - | - | $1,826,660 | $19,266 | $5,339,128 |
| 2002 | $950,004 | $1,745,633 | $100,720 | $944,790 | - | 224,000 | - | - | $918,496 | $18,151 | $4,677,794 |

Cutler is a citizen of Ohio.

12.     Defendant Richard H. Fearon ("Fearon") is Eaton's Chief Financial and Planning Officer and has been since April 2002 and a Vice Chairman and has been since January 2009. Fearon was also an Eaton Executive Vice President from April 2002 to January 2009.  Fearon is responsible for the Company's improper and illegal arrangements with the OEMs.  Fearon knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Fearon the following compensation as an executive:

| Year | Salary | Bonus | Other Annual Compensation | Stock Awards | Option Awards | Stock Options (Shares) | Non-Equity Incentive Plan Compensation | Change in Pension Value | Long-Term Incentive Payouts | All Other Compensation |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | $635,160 | - | - | $1,340,674 | - | - | $2,047,162 | $419,822 | - | $100,394 |
| 2009 | $574,782 | - | - | $2,310,737 | - | - | $165,000 | $413,169 | - | $115,435 |
| 2008 | $596,730 | - | - | $1,205,385 | $562,094 | - | $1,193,860 | $298,183 | - | $110,631 |
| 2007 | $511,695 | - | - | $1,389,932 | $568,640 | - | $2,894,807 | $243,751 | - | $80,839 |
| 2006 | $478,140 | - | - | $430,919 | $544,295 | - | $2,896,824 | $246,194 | - | $50,885 |
| 2005 | $475,070 | $534,466 | $7,493 | $1,112,349 | - | 34,200 | - | - | $1,850,522 | $11,987 |
| 2004 | $456,770 | $761,298 | - | $295,000 | - | 44,000 | - | - | $1,028,563 | $11,064 |
| 2003 | $439,184 | $476,110 | - | $175,125 | - | 44,000 | - | - | $407,289 | $12,900 |
| 2002 | $301,045 | $507,616 | $45,874 | $422,900 | - | 44,000 | - | - | $73,909 | $171,891 |

Fearon is a citizen of Ohio.

13.     Defendant Ned C. Lautenbach ("Lautenbach") is an Eaton director and has been since 1997.  Lautenbach was also Eaton's Lead Director from 2010 to at least March 2011. Lautenbach was Chairman of Eaton's Governance Committee from at least March 2008 to at least March 2011 and was a member of that committee from at least March 2007 to at least March 2011.  Lautenbach was also a member of Eaton's Audit Committee from at least March

2007 to at least March 2010.  Lautenbach is responsible for the Company's improper and illegal arrangements with the OEMs.  Lautenbach knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Lautenbach the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2010 | $175,500 | $68,003 | - | $5,974 | $249,477 |
| 2009 | $125,560 | $69,341 | - | $3,248 | $198,149 |
| 2008 | $120,000 | - | $57,308 | $194 | $177,502 |
| 2007 | $118,667 | - | $55,121 | $2,006 | $175,794 |
| 2006 | $109,667 | - | $57,894 | - | $167,561 |

Lautenbach is a citizen of Florida.

14.     Defendant Gary L. Tooker ("Tooker") is an Eaton director and has been since 1992.  Tooker was also a member of Eaton's Governance Committee from at least March 2007 to at least March 2011, and a member of the Audit Committee from at least March 2006 to at least March 2010.  Tooker is responsible for the Company's improper and illegal arrangements with the OEMs.  Tooker knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Tooker the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2010 | $142,500 | $68,003 | - | - | $5,974 | $216,477 |
| 2009 | $112,560 | $69,341 | | $63 | $3,248 | $185,212 |
| 2008 | $116,000 | - | $57,308 | $677 | $194 | $174,179 |
| 2007 | $118,000 | - | $55,121 | $6,120 | $2,006 | $181,247 |
| 2006 | $122,000 | - | $57,894 | $4,991 | - | $184,885 |

Tooker is a citizen of Arizona.

15.     Defendant Michael J. Critelli ("Critelli") is an Eaton director and has been since 1998.  Critelli was also a member of Eaton's Governance Committee from at least March 2002 to at least March 2006, and a member of the Audit Committee in at least March 2011.  Critelli is responsible for the Company's improper and illegal arrangements with the OEMs.  Critelli knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal,

anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Critelli the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2010 | $135,000 | $68,003 | - | $5,974 | $208,977 |
| 2009 | $106,560 | $69,341 | - | $3,248 | $179,149 |
| 2008 | $111,000 | - | $57,308 | $194 | $168,502 |
| 2007 | $123,000 | - | $55,121 | $2,006 | $180,127 |
| 2006 | $115,500 | - | $57,894 | - | $173,394 |

Critelli is a citizen of Connecticut.

16.    Defendant Deborah L. McCoy ("McCoy") is an Eaton director and has been since 2000.  McCoy was also a member of Eaton's Governance Committee from at least March 2002 to at least March 2006, and a member of the Audit Committee from at least March 2002 to at least March 2005.  McCoy is responsible for the Company's improper and illegal arrangements with the OEMs.  McCoy knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid McCoy the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2010 | $165,000 | $68,003 | - | $5,974 | $238,977 |
| 2009 | $134,560 | $69,341 | - | $3,248 | $207,149 |
| 2008 | $114,000 | - | $57,308 | $194 | $171,502 |
| 2007 | $110,000 | - | $55,121 | $2,006 | $167,127 |
| 2006 | $112,000 | - | $57,894 | - | $169,894 |

McCoy is a citizen of Texas.

17.    Defendant Gregory R. Page ("Page") is an Eaton director and has been since 2003.  Page was also a member of Eaton's Audit Committee in at least March 2011.  Page is responsible for the Company's improper and illegal arrangements with the OEMs.  Page knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Page the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2010 | $145,000 | $68,003 | - | $1,154 | $5,974 | $220,131 |
| 2009 | $114,560 | $69,341 | - | $841 | $3,248 | $187,990 |
| 2008 | $111,000 | - | $57,308 | $1,207 | $194 | $169,709 |
| 2007 | $115,000 | - | $55,121 | $2,346 | $2,006 | $174,473 |
| 2006 | $107,332 | - | $57,894 | $604 | - | $165,830 |

Page is a citizen of Minnesota.

18.     Defendant Christopher M. Connor ("Connor") is an Eaton director and has been since 2006.  Connor was also a member of Eaton's Governance Committee from at least March 2007 to at least March 2011.  Connor is responsible for the Company's improper and illegal arrangements with the OEMs.  Connor knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Connor the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2010 | $141,000 | $68,003 | - | $5,974 | $214,977 |
| 2009 | $106,560 | $69,341 | - | $3,248 | $179,149 |
| 2008 | $106,000 | - | $57,308 | $194 | $163,502 |
| 2007 | $110,000 | - | $55,121 | $2,006 | $167,127 |
| 2006 | $79,000 | - | $194,100 | - | $273,100 |

Connor is a citizen of Ohio.

19.     Defendant Charles E. Golden ("Golden") is an Eaton director and has been since 2007.  Golden was also Chairman of Eaton's Audit Committee from at least March 2008 to at least March 2011, and was a member of that committee from January 2007 to at least March 2011.  Golden is responsible for the Company's improper and illegal arrangements with the OEMs.  Golden knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Golden the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2010 | $166,500 | $68,003 | - | $5,974 | $240,477 |
| 2009 | $140,560 | $69,341 | - | $3,248 | $213,149 |
| 2008 | $123,000 | - | $57,308 | $194 | $180,502 |
| 2007 | $112,250 | - | $171,000 | $1,839 | $285,089 |

Golden is a citizen of Indiana.

20.     Defendant Arthur E. Johnson ("Johnson") is an Eaton director and has been since 2009.  Johnson was also a member of Eaton's Governance Committee and Audit Committee from January 2009 to at least March 2011.  Johnson is responsible for the Company's improper and illegal arrangements with the OEMs.  Johnson knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Johnson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $142,500 | $68,003 | $5,974 | $216,477 |
| 2009 | $110,560 | $69,341 | $3,248 | $183,149 |

Johnson is a citizen of Virginia.

21.     Defendant Todd M. Bluedorn ("Bluedorn") is an Eaton director and has been since 2010.  Bluedorn was also a member of Eaton's Governance Committee from January 2010 to at least March 2011.  Bluedorn is responsible for the Company's improper and illegal arrangements with the OEMs.  Bluedorn knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Bluedorn the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $139,000 | $68,003 | $2,554 | $209,557 |

Bluedorn is a citizen of Texas.

22.     Defendant George S. Barrett ("Barrett") is an Eaton director and has been since April 2011.  Barrett is responsible for the Company's improper and illegal arrangements with the OEMs.  Barrett knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Barrett is a citizen of Ohio.

23.     Defendant John R. Miller ("Miller") was an Eaton director from 1985 to April 2010.  Miller was also a member of Eaton's Governance Committee from at least March 2002 to

at least March 2010, and was Chairman of that committee from at least March 2006 to at least March 2007.  Miller was a member of Eaton's Audit Committee from at least March 2002 to at least March 2007.  Miller is responsible for the Company's improper and illegal arrangements with the OEMs.  Miller knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Miller the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2010 | $60,000 | $68,003 | - | - | $1,485 | $129,488 |
| 2009 | $106,560 | $69,341 | - | $1,589 | $3,248 | $180,738 |
| 2008 | $112,000 | - | $57,308 | $1,622 | $194 | $171,124 |
| 2007 | $119,333 | - | $55,121 | $18,894 | $2,006 | $195,354 |
| 2006 | $137,500 | - | $57,894 | $67,125 | - | $262,519 |

Miller is a citizen of Ohio.

24.     Defendant Victor A. Pelson ("Pelson") was an Eaton director from 1994 to April 2010.  Pelson was also a member of Eaton's Governance Committee from at least March 2006 to at least March 2010.  Pelson was a member of Eaton's Audit Committee from at least March 2002 to at least March 2010, and was Chairman of that committee from at least March 2003 to at least March 2007.  Pelson is responsible for the Company's improper and illegal arrangements with the OEMs.  Pelson knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Pelson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2010 | $58,000 | $68,003 | - | - | $1,485 | $127,488 |
| 2009 | $114,560 | $69,341 | - | $463 | $3,248 | $187,612 |
| 2008 | $114,000 | - | $57,308 | $2,333 | $194 | $173,835 |
| 2007 | $122,750 | - | $55,121 | $6,786 | $5,006 | $189,663 |
| 2006 | $132,000 | - | $57,894 | $10,122 | - | $200,016 |

Pelson is a citizen of Florida.

25.     Defendant Ernie Green ("Green") was an Eaton director from 1995 to April 2011. Green was also a member of Eaton's Governance Committee from at least March 2002 to at least March 2005, and a member of the Audit Committee from at least March 2008 to at least March 2011.   Green is responsible for the Company's improper and illegal arrangements with the OEMs.   Green knowingly or recklessly failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  Eaton paid Green the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2010 | $136,500 | $68,003 | - | - | $5,974 | $210,477 |
| 2009 | $112,560 | $69,341 | - | $268 | $3,248 | $185,417 |
| 2008 | $108,000 | - | $57,308 | $2,983 | $194 | $168,485 |
| 2007 | $114,000 | - | $55,121 | $12,081 | $2,006 | $183,208 |
| 2006 | $100,000 | - | $57,894 | $10,051 | - | $167,945 |

26.     The defendants identified in ¶¶11-12 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶11, 13-25 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶13-17, 19-20, 23-25 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶13-16, 18, 20-21, 23-25 are referred to herein as the "Governance Committee Defendants."  Collectively, the defendants identified in ¶¶11-25 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

27.     By reason of their positions as officers, directors, and/or fiduciaries of Eaton and because of their ability to control the business and corporate affairs of Eaton, the Individual Defendants owed and owe Eaton and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Eaton in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Eaton and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28.     Each officer and director of the Company owed to Eaton and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, Eaton required all of its directors and officers to abide by the fundamental principles of ethical behavior listed in their Ethics Guide.  The Ethics Guide stated in part:

> We gain competitive advantage through superior performance.  We do not engage in unethical or illegal trade practices.

> *   *   *

> Employees must avoid … [u]sing tactics that eliminate competition in markets where the company is a leader, including selling below marginal cost and other predatory practices where the effect is to eliminate competition.

**Additional Duties of the Audit Committee Defendants**

29.     In addition to these duties, the Audit Committee Defendants owed specific duties to Eaton to oversee the "Company's compliance with legal and regulatory requirements."

**Additional Duties of the Governance Committee Defendants**

30.     In addition to these duties, the Governance Committee Defendants owed specific duties to Eaton to provide oversight regarding significant public policy issues with respect to the Company's relationships with shareholders, employees, customers, competitors, and suppliers and the communities in which it operates.  Pursuant to the Governance Committee's Charter, the members of the Governance Committee were responsible for reviewing "the Company's Code of Ethics, including its programs to promote ethical and legal conduct, to facilitate anonymous reporting of violations and to assure protection of employees who report violations in good faith…."

**Control, Access, and Authority**

31.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Eaton, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     Because of their advisory, executive, managerial, and directorial positions with Eaton, each of the Individual Defendants had access to adverse, non-public information about Eaton's illegal, anticompetitive dealings with the OEMs.  The Individual Defendants failed to implement the proper internal controls that would terminate the Company's improper and illegal contacts with the OEMs before these relations solidified and the Company spiraled into tremendous liability.

33.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Eaton, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

34.     To discharge their duties, the officers and directors of Eaton were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Eaton were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority in negotiating with the OEMs;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Eaton conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(d)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(e)     refrain from acting upon material, inside corporate information to benefit themselves; and

(f)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health.

**Breaches of Duties**

35.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Eaton, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Eaton's Board.

36.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in an illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a direct and proximate result of the conspiracy (or conspiracies) complained of herein, Eaton lost a lawsuit to its only true competitor, ZF Meritor, who is seeking more than $800 million in damages.  In that lawsuit, the jury found Eaton's exclusivity agreements with the OEMs constituted a contract, combination, or conspiracy that unreasonably restrained trade in violation of Federal law.  In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of multiple class action lawsuits that allege violations

of antitrust laws brought by market participants injured by Eaton's anticompetitive practices. As a result, Eaton has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

37. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

38. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Eaton, regarding the Individual Defendants' management of Eaton's operations and Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power; and (ii) enrich the Individual Defendants' executive and directorial positions at Eaton and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

39. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants failed to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.

40. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

41. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly allowing the Company to engage in an illegal, anticompetitive conspiracy to maintain and

enhance its monopoly power.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

42.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

43.    In one of its main lines of business, Eaton manufactures and supplies Class 8 transmissions for OEMs of Class 8 trucks.

44.    A transmission sends power from a vehicle's engine to its drive wheels.  When equipped with the proper transmission, the engine produces sufficient force to accelerate and maintain a vehicle's speed.

45.    There are eight recognized classes of vehicles which employ different transmissions.  Class 8 trucks are the heaviest, weighing over 33,000 pounds.  Class 8 transmissions are built to withstand the force generated by the diesel engines that power heavy duty trucks.

46.    Class 8 transmissions can be divided into three product categories: linehaul, vocational, and specialty.  Purchasers of Class 8 transmissions intend to use them for a particular vehicle (i.e., linehaul, vocational, or specialty) and are unlikely to substitute a transmission intended for a different vehicle type.

47.    Approximately 70% of Class 8 transmissions are used in linehaul trucks ("Class 8 Linehaul Transmissions").  Linehaul trucks are designed to carry freight long distances, travel 60,000 miles or more a year, and operate mostly on highways or other paved surfaces.

48.     About 26% of Class 8 transmissions are used in vocational trucks.   Class 8 transmissions used for vocational applications ("Class 8 Vocational Transmissions") are found in heavy duty trucks operating in rugged performance environments like dirt, mud, sand or gravel.

49.     The remainder of Class 8 transmissions, about 4%, are sold for specialty trucks. Class 8 transmissions used for specialty applications ("Class 8 Specialty Transmissions") are primarily used in "stop and start" vehicles, such as garbage, fire, and delivery trucks.

50.     When selecting components for a new truck purchase, truck buyers refer to OEMs' product databooks or online ordering software, which list the OEMs' component offerings, including transmissions.  For each component, one brand will be listed as "standard," while others may be listed as optional.  Optional transmissions are usually priced at a mark-up above the price of the standard transmission.  The standard transmission is considered to be the OEM's preferred choice.   Truck buyers are more likely to purchase the OEMs' standard component due to this preferred choice with the cost advantages.

51.     When a transmission is not listed as an option – i.e., it is excluded from the OEMs' databook – the transmission manufacturer's ability to sell the transmission is severely diminished, if not completely eliminated.  The unlisted transmission, if available at all, is always priced with an up-charge.

52.     In addition to using databook position to increase demand for its transmissions, a transmission manufacturer may try to "pull-through" downstream sales by enticing the truck buyer to order a particular transmission from an OEM.  Pull-through devices include monetary incentives such as discounts or competitive equalization payments (i.e., payments to customers to meet a competitor's price or "equalize" the price), as well as non-monetary incentives such as demonstrations of product superiority and value.  However, when a manufacturer's transmission is excluded from the OEM databook, pull-through marketing becomes considerably more costly and far less effective.

53.     By the late 1980s, Eaton held at least an 80% market share for Class 8 transmissions and the standard position in the databooks for nearly every truck model at each of

the OEMs in the submarkets for Class 8 Linehaul and Vocational Transmissions.  Eaton described itself as "solidly entrenched" in the marketplace.  The landscape of the Class 8 truck market however, changed dramatically between 1996 and the early 2000s.  In 1996, seven OEMs manufactured heavy duty trucks including Freightliner, PACCAR, International (via Navistar), Volvo, Mack, Sterling, and Western Star.

54.     Following a series of acquisitions, the number of OEMs was reduced to four: Freightliner, PACCAR, International, and Volvo/Mack.  These acquisitions included Freightliner purchasing the heavy truck division of Ford Motor Company, Freightliner purchasing Western Star trucks, and Volvo buying Mack.  The four remaining OEMs now each had substantially equal market share.

55.     ZF Meritor (then known as Meritor Automotive Inc.), Eaton's biggest competitor, improved its competitive position in 1999 by entering into a joint venture with ZF Friedrichshafen AG, a European manufacturer of heavy duty transmissions.  The joint venture, named ZF Meritor, used its collective expertise to develop and market the industry's first fully automated, two pedal (accelerator and brake only, no clutch pedal) manual Class 8 truck transmissions.  The successful launch of this revolutionary transmission increased ZF Meritor's sales volume and positioned it to expand its transmission offerings to serve a wider variety of heavy duty truck applications.  Eaton's management was cognizant of ZF Meritor's growing penetration into the Class 8 Truck Transmissions Market, as evidenced by a PowerPoint presentation created in approximately 2000, wherein Eaton noted that its dominant market "Position is at Risk" and that ZF Meritor was viewed as a "Serious Competitor" and a "real threat."

56.     In 2000, the market for Class 8 trucks experienced a substantial downtown, causing a significant reduction in sales volume among the OEMs and other market participants, including Eaton and ZF Meritor.  For example, from 2000 to 2002, Eaton lost almost two-thirds of its market volume for heavy-duty transmissions.  Instead of responding to these unfavorable market conditions in a competitive manner, however, Eaton and the OEMs hatched a plan to

eliminate competition in the market for Class 8 truck transmissions, while at the same time stabilizing and fixing prices for Class 8 truck transmissions.

## CONSPIRACY TO ESTABLISH, MAINTAIN AND EXPAND
## THE COMPANY'S MONOPOLY

57.     Faced with increasing competitive pressure in the Class 8 Truck Transmissions Market, Eaton along with the OEMs created a scheme whereby each of the OEMs would enter into a *de facto* exclusive dealing agreement with Eaton, which would provide over 90% of each manufacturer's Class 8 transmission needs.   In exchange, the OEMs would list Eaton's transmissions as "standard" in their databooks.  In order to maintain Eaton's 90%+ market share, each OEM would either remove comparable ZF Meritor transmissions from the databooks or offer the ZF Meritor transmissions as high-cost options despite the fact that the ZF Meritor transmissions were often substantially less expensive.  In return, Eaton would provide the OEMs with hefty "rebates" once market share targets were met by each OEM.

58.     On information and belief, according to Ken Davis, the President of Eaton's Americas Vehicle Group, Freightliner initially approached Eaton and "their proposal to us was that they wanted to reduce the number of suppliers."  Eaton's James Sweetnam similarly testified that the OEMs "had approached [Eaton]" regarding the long-term exclusive dealing agreements ("LTAs").

59.     An internal PowerPoint presentation titled "LTA Update," dated October 16, 2000, described defendants' strategy as more than a series of "Contracts," and instead sought to build "Partnerships."   According to this presentation, "[a] Partnership is defined as a business relationship wherein both parties agree to assist one another in growing their business more profitably."  The presentation went on to explain how the "Partnership" would function: "We agree to establish a working team, which will be charged with developing and growing the business opportunities for both companies."  The PowerPoint further discussed LTAs generally, stating that they provide a "Competitive Advantage in the Market" through "Databook Position."

60.     The LTAs contained lucrative bundled rebate and share penetration payments that the OEMs would achieve by diverting purchasers of transmissions to Eaton transmissions, and

which therefore provided a mechanism by which Eaton could share monopoly rents with its OEM co-conspirators.  By the LTAs, the OEMs agreed to exclude transmissions manufactured by Eaton's competitors or to penalize customers with higher prices or other punitive measures if those customers selected a competitor's transmission over an Eaton transmission.  Eaton and the OEMs agreed that the OEMs would refuse to offer competing transmissions, or dissuade customers from purchasing them, despite customer demand.  Ultimately, the agreements between and among Eaton and the OEMs to foreclose competition in the Class 8 Truck Transmissions Market in the United States were highly effective.  Indeed, defendants' anticompetitive, illegal conspiracy described herein caused the only visible competitor at the time, ZF Meritor, to be foreclosed from over 90% of sales in the Class 8 Linehaul Transmissions submarket and from 100% of sales in the Class 8 Vocational Transmissions submarket.

61.     On information and belief, when ZF Meritor learned about the conspiracy among Eaton and the OEMs, it approached the OEMs with competitive offers for Class 8 truck transmissions.  The OEMs responded that they could not negotiate with ZF Meritor because of their restrictive agreements with Eaton.  According to Dennis Kline, Vice President of Global Sales at ZF Meritor, "I went to each and every one of them [the OEMs].  I tried to understand.  My understanding was almost to a man, it was a very, worrisome-type of situation.  And what they were explaining to me, and we came to learn, was that there were very, very restrictive agreements in place."  Kline continued, "[m]y understanding was that customer by customer, they had accepted deals that were going to exclude us from the marketplace that had very, very rich payoffs if they did that…Each and every one of those OEMs, my understanding was that they struck new deals and that those deals were going to put us in a situation where we could not attain market share.  And our competitor, again, as I described yesterday, in a word that nobody liked, was, our competitor was going to wind up, again, with a monopoly."

62.     On information and belief, the OEMs uniformly refused to even consider lower-cost counter-proposals from ZF Meritor.  For example, according to Kline's testimony, ZF

Meritor made multiple price discount offers to Volvo/Mack during numerous meetings, all of which were rejected.

63.     The agreements between and among Eaton and Freightliner, Volvo/Mack, PACCAR, and International, or alternately the single, overarching agreement among Eaton and the OEMs which was completed in October 2002, ensured that Eaton maintained more than a 90% share in the Class 8 Truck Transmissions Market, virtually guaranteeing that no competitor to Eaton would ever be able to gain sufficient market share to support entry into, or expansion of, sales in the Class 8 Truck Transmissions Market.

64.     As a direct and proximate result of the conspiracy (or conspiracies) complained of herein, Eaton's only competitor, ZF Meritor, lost a substantial share in the Class 8 Truck Transmissions Market, curtailed much of its operations, and subsequently filed a lawsuit against Eaton based on the conduct alleged herein.  In that lawsuit, the jury found Eaton's exclusivity agreements with the OEMs constituted a contract, combination, or conspiracy that unreasonably restrained trade in violation of Federal law.

65.     In 2005, the original Eaton/International LTA expired, but during the negotiation of a new LTA, Eaton and International agreed to continue their relationship under the general guidelines of the previous agreement.  In February 2007, after an extended negotiation, Eaton and International entered into a new LTA.  In the new agreement, International agreed to exclusively market Eaton's automated manual transmissions.

66.     On information and belief, in June 2007, with the initial Eaton/PACCAR LTA nearing expiration, Eaton and PACCAR agreed that their current business relationship, established by the LTA, would continue after the expiration date on the same terms and conditions.

67.     In late-2007, Eaton and Volvo/Mack agreed to a new LTA. Like the 2002 LTA, the new agreement contained benefits triggered by limiting the share of sales that Eaton's competitors attained at Volvo/Mack.

68.     The foregoing anticompetitive conduct by defendants, and the resultant injuries, occurred throughout the relevant period, and continues to date, as Eaton and the OEMs still operate under existing or renewed *de facto* exclusive dealing contracts, and continue to engage in other conspiratorial behavior in furtherance of the conspiracy or conspiracies to foreclose competition in the Class 8 Truck Transmissions Market.

## DAMAGES TO EATON

69.     As a result of the Individual Defendants' improprieties, Eaton engaged in an illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.  These illegal acts were discovered and caused the Company to incur mounting legal fees in defending itself. Despite all this money spent, on October 30 2009, a jury determined that Eaton's exclusivity agreements with the OEMs constituted a contract, combination, or conspiracy that unreasonably restrained trade.  Having lost in its suit against ZF Meritor, Eaton is now facing massive damage awards.  ZF Meritor is seeking more than $800 million in damages.  The judgment and damages award is currently on appeal.  In addition, the Company is now the subject of multiple class action lawsuits that allege violations of antitrust laws.

70.     Further, as a direct and proximate result of the Individual Defendants' actions, Eaton has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to rebates/awards paid pursuant to LTAs.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

71.     Plaintiff brings this action derivatively in the right and for the benefit of Eaton to redress injuries suffered, and to be suffered, by Eaton as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Eaton is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

72.     Plaintiff will adequately and fairly represent the interests of Eaton in enforcing and prosecuting its rights.

73.     Plaintiff was a shareholder of Eaton at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Eaton shareholder.

74.     The current Board of Eaton consists of the following eleven individuals: defendants Cutler, Lautenbach, Tooker, Critelli, McCoy, Page, Connor, Golden, Johnson, Bluedorn, and Barrett.  Eight of these Board members have been there since 2007 or earlier. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

75.     The defendants' challenged misconduct at the heart of this case constitutes a threat to the survival of the Company's core business.  As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread improper activities.  The improper and illegal arrangements with the OEMs have already lasted about a decade and continue to affect the market to this very day.  The Company faces over $800 million in damages in its suit with ZF Meritor alone; this is not to mention the huge legal fees and damages that still wait in the two pending class action suits brought by market participants injured by the Individual Defendants' illegal acts.  Causing the Company to engage in the improper tactics that threaten its survival is not a protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

**Demand Is Excused Because Defendants Face a Substantial Likelihood of Liability for Their Misconduct**

76.     As alleged above, defendants breached their fiduciary duties of loyalty by approving the agreements with the OEMs and failing to implement the proper internal controls to police Eaton's illegal, anticompetitive conspiracy to maintain and enhance its monopoly power.

77.     The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, defendants Lautenbach, Tooker, Critelli, McCoy, Page, Golden, and Johnson were responsible for knowingly or recklessly allowing the

illegal, anticompetitive conspiracy to endure and the resulting improper statements related to the Company's earnings guidance to linger.  Despite their knowledge or reckless disregard, Lautenbach, Tooker, Critelli, McCoy, Page, Golden, and Johnson caused these improper statements in light of the Company's growing liabilities.  Accordingly, Lautenbach, Tooker, Critelli, McCoy, Page, Golden, and Johnson breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, Lautenbach, Tooker, Critelli, McCoy, Page, Golden, and Johnson face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

78.     The Governance Committee's Charter provides that it is responsible for reviewing "the Company's Code of Ethics, including its programs to promote ethical and legal conduct, to facilitate anonymous reporting of violations and to assure protection of employees who report violations in good faith…."  Furthermore, the Governance Committee members were responsible for overseeing the relationships with "competitors."  Thus, defendants Lautenbach, Tooker, Critelli, McCoy, Connor, Johnson, and Bluedorn were responsible for knowingly or recklessly allowing the illegal, anticompetitive conspiracy to endure and the resulting improper statements related to the Company's earnings guidance to linger.  Despite their knowledge or reckless disregard, Lautenbach, Tooker, Critelli, McCoy, Connor, Johnson, and Bluedorn caused these improper statements in light of the Company's growing liabilities.  Accordingly, Lautenbach, Tooker, Critelli, McCoy, Connor, Johnson, and Bluedorn breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, Lautenbach, Tooker, Critelli, McCoy, Connor, Johnson, and Bluedorn face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

79.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the implementation of appropriate internal controls that would police illegal anticompetitive arrangements with the OEMs.  Thus, each Individual Defendant faces a

substantial likelihood of liability for the breach of fiduciary duties so any demand upon any of them is futile.

80.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by Eaton's officers and directors and these acts are incapable of ratification.

81.     Each of the defendant directors of Eaton authorized and/or permitted the improper and illegal anticompetitive conspiracy to endure and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

82.     Eaton has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Eaton any part of the damages Eaton suffered and will suffer thereby.

83.     If Eaton's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Eaton. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Eaton against these defendants, known as the "insured versus insured exclusion."  As a result, if these directors were to cause Eaton to sue themselves or certain of the officers of Eaton, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors and officers' liability insurance, then the current directors will not cause Eaton to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

84.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Eaton for any of the wrongdoing alleged by plaintiff herein.

85.     Plaintiff has not made any demand on the other shareholders of Eaton to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Eaton is a publicly held company with over 334.2 million shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.     The Individual Defendants owed and owe Eaton fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Eaton the highest obligation of good faith, fair dealing, loyalty, and due care.

88.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Eaton, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

89.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) that the

Company engaged in an illegal, anticompetitive conspiracy with the OEMs; (ii) that it was only a matter of time that this conspiracy to maintain an illegal monopoly would be discovered; and (iii) that the discovery of these illegal acts would lead to massive liability and legal fees. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

90.     Director Defendants, as directors of the Company, owed Eaton the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the Company's involvement in an illegal conspiracy to maintain a monopoly. The Director Defendants knew or were reckless in not knowing that: (i) that the Company engaged in an illegal, anticompetitive conspiracy with the OEMs; (ii) that it was only a matter of time that this conspiracy to maintain an illegal monopoly would be discovered; and (iii) that the discovery of these illegal acts would lead to massive liability and legal fees.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

91.     The Audit Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly allowing the illegal, anticompetitive conspiracy to endure.  The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

92.     The Governance Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly allowing the illegal, anticompetitive conspiracy to endure.  The Governance Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to promote ethical and legal conduct, as required by the Governance Committee Charter and the Company's Code of Ethics in effect at the time.

93.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Eaton has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

94.     Plaintiff, on behalf of Eaton, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

95.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.     The Company engaged in an illegal, anticompetitive conspiracy with the OEMs and is now facing substantial liability multiple lawsuits.  By failing to conduct proper supervision, the Individual Defendants have caused Eaton to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

97.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

98.     Plaintiff, on behalf of Eaton, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Eaton.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Eaton.

101.     Plaintiff, as a shareholder and representative of Eaton, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

102.     Plaintiff, on behalf of Eaton, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Eaton, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Eaton to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Eaton and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2.      a provision to permit the shareholders of Eaton to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Eaton has an effective remedy;

D.      Awarding to Eaton restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants,

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 18, 2011        LANDSKRONER GRIECO MERRIMAN, LLC
JACK LANDSKRONER


s/Jack Landskroner
_____
JACK LANDSKRONER (0059227)

Drew Legando (0084209)
1360 West 9th, Suite 200
Cleveland, OH  44113
Telephone: (216) 522-9000
Facsimile: (216) 522-9007
jack@lgmlegal.com
drew@lgmlegal.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991
brobbins@robbinsumeda.com

HOLZER HOLZER & FISTEL LLC
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: (770) 392-0090
Facsimile:  (770) 392-0029
mfistel@holzerlaw.com

Attorneys for Plaintiff

673677

## VERIFICATION

I, James Clem, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 11/17/11

_____
JAMES CLEM